IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 9, 2024

**STATE OF TENNESSEE v. ERIC LAMAR CAFFEY**

**Appeal from the Circuit Court for Montgomery County**
**No. 63CC1-2020-CR-752  William R. Goodman, III, Judge**

_____

**No. M2023-01306-CCA-R3-CD**

_____

The Defendant, Eric Lamar Caffey, was convicted by a Montgomery County jury of second degree murder.  He raises two issues on appeal: (1) whether his due process rights to a fair trial were violated by the State's failure to correct false testimony given by a material witness; and (2) whether the evidence was sufficient to sustain his conviction.  Based on our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and ROBERT W. WEDEMEYER, J., joined.

Gordon W. Rahn, Clarksville, Tennessee, (on appeal) and Travis Meeks, Clarksville, Tennessee (at trial), for the appellant, Eric Lamar Caffey.

Jonathan Skrmetti, Attorney General and Reporter; Katherine Orr, Assistant Attorney General; Robert J. Nash, District Attorney General; and Michael Pugh and Stanley Brooks, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case arises out of the shooting death of forty-six-year-old Christopher Young, which occurred shortly after midnight on May 13, 2020, as he was sitting in the driver's seat of his vehicle parked outside the Clarksville apartment he shared with his mother. Shortly before the victim arrived home, Tresa Davenport, who lived with her boyfriend, Ryan Comly, in the same apartment complex, saw a man dressed in black in the parking

lot by her apartment. A few minutes later, she and Mr. Comly saw someone they believed to be the same man approach the driver's door of the victim's vehicle and begin punching the victim. Ms. Davenport also heard the man demand that the victim give him the victim's "s**t." Both she and Mr. Comly went inside their apartment, and Ms. Davenport was calling the Clarksville Police Department ("CPD")'s non-emergency line when she heard gunshots, hung up, and called 911. The Defendant and his then-girlfriend, Amber Tanner, were quickly developed as suspects, and both were subsequently indicted for the first degree felony murder and the attempted aggravated robbery of the victim. Co-Defendant Tanner's case was later severed, and she testified for the State at the Defendant's September 2022 trial.

Tresa Davenport, the State's first witness at trial, testified that in May 2020 she lived with Mr. Comly and Mr. Comly's children in an apartment complex on Cobalt Drive. Mr. Comly arrived home from work at approximately midnight on May 13, 2020, and the two of them were sitting outside smoking and talking when she noticed a man standing in the parking lot "looking around." The man was 5'8" to 6' tall, stocky, and dressed from head-to-toe in black, including a black hoodie. She was unable to see his face. After standing in the parking lot and looking around for several minutes, the man walked away.

Ms. Davenport testified that she and Mr. Comly were still outside when the victim pulled up to his apartment in his vehicle. She said the man in black approached the victim's driver's door, and she heard arguing and yelling. She then heard the man in black say, "Give me your s**t. Give me the s**t[,]" or words to that effect. She also heard "pounding," and the victim screaming for help. Ms. Davenport later clarified that the "pounding" she heard was the man in black punching the victim as the victim sat in his vehicle. She was unsure if the punching occurred before or after the man in black demanded the victim's "s**t." She said that Mr. Comly instructed her to go inside, and that she was calling the CPD's non-emergency number when she heard gunshots, hung up, and dialed 911 instead. She stated that Mr. Comly ran inside at about the same time that she heard the gunshots.

Ms. Davenport testified that the man in black was in the parking lot in front of her apartment when she first saw him. When she saw him at the victim's vehicle, he was on the other side of four or five trees that separated her apartment from the victim's. However, the trunks of the trees were not very thick, and she was able to clearly see around them. She said that the lights in the area regularly went on and off, and she was unsure whether they were on or off when she saw the man punching the victim. She stated that she saw him punch the victim three or four times.

On cross-examination, Ms. Davenport acknowledged that she told the police that the light across the street was off at the time she saw the altercation. She denied that a red

truck was parked between her and the victim's apartment and insisted that she "had perfect eyeline of . . . [the victim's] apartment the entire time." After refreshing her memory with her written statement to police, she acknowledged having mentioned a parked red truck but was still adamant that neither the truck nor the trees obscured her view of the victim's apartment. She acknowledged having told the 911 operator that she assumed the assailant was black. She explained that, because it was dark and he was dressed completely in black, she thought she would have noticed had his skin color been white. She admitted that she did not tell the 911 operator of having overheard the man asking the victim for his "s**t" but insisted that she heard those words. She said she always wore her eyeglasses and was wearing them that night. She could not remember having told the police that she thought the assailant was a neighborhood teenager with dreadlocks. Finally, she acknowledged that she did not witness the murder and had no idea if a second assailant was involved.

On redirect examination, she identified the handwritten statement she gave police at approximately 3:50 a.m. on the day of the murder in which she mentioned the assailant's having demanded that the victim give him his "s**t." On recross examination, she testified that she was "pretty sure" that the assailant was a black man, although she never saw his face. When shown bodycam video of one of the responding officers, she acknowledged that she told the police that she did not see the victim pull up to his apartment. On re-redirect examination, she agreed that she also told the police that the light was on during a portion of the time that she saw the assailant at the victim's vehicle.

Ryan A. Comly testified that he arrived home from work at approximately 12:00 a.m. on May 13, 2020. As he was pulling up to his apartment, he noticed someone dressed in "all-black" standing in the parking lot next to his neighbor's van. He said that he went inside to change clothes and to check on his sleeping sons and then went back outside to smoke a cigarette with Ms. Davenport. Although not certain, he believed that Ms. Davenport was already sitting outside when he arrived home. He stated that the individual in black was gone by the time he came back outside. However, a few minutes later, he saw someone walk across the street toward the victim's apartment, which was located diagonally across from his apartment. There were trees between his apartment and the victim's apartment, but the trees were small with skinny trunks and the leaves "up high[,]" affording him a clear view of "that whole section."

Mr. Comly testified that the victim was still in his vehicle with his headlights on when the individual dressed in all-black approached him. It appeared to Mr. Comly that the victim knew the individual. Mr. Comly testified that he caught a glimpse of the individual's skin color as he walked across the street under a streetlight, and although not certain, the individual appeared to him to be black. He stated that the victim's vehicle door opened, and the individual in black began swinging his fist at the victim. He heard the victim yell for help and "What did I do?" At that point, Mr. Comly went inside his

- 3 -

apartment to tell Ms. Davenport to call the police and to search for a bat or crowbar or similar item with which to aid the victim. He said that as Ms. Davenport was on the phone with the 911 operator, he heard a total of five or six gunshots. Afterward, he went to the victim's apartment, where he found the victim lying half-in and half-out of his vehicle as someone attempted to give him CPR.

On cross-examination, Mr. Comly testified that he did not see the face or skin color of the individual in black standing in his parking lot or of the individual in black who punched the victim. He did not recall seeing a red truck and denied any vehicle obscured his view of the victim's apartment. When shown a bodycam video of one of the responding officers, he testified that the red truck visible in the video was not present at the time he witnessed the altercation at the victim's vehicle, and that he had seen a crime scene officer exit that red truck after the arrival of the police. He said he did not see the victim pull up; by the time he noticed him, the victim was sitting in his vehicle in his parking space with his headlights still on.

Mr. Comly testified that the individual in black was wearing black sweatpants and a black hoodie with a white logo on it. The hoodie was pulled over the individual's head, and he never saw his face. He was unsure if the individual was white or black until the streetlight came on, and he saw that the individual's hands were dark. It was possible, however, that the individual was wearing gloves. He stated that the individual was medium-sized but later acknowledged having described him to police officers as skinny. He did not remember having told officers that the individual had dreadlocks or that he thought he recognized him from the neighborhood. He said he told the officers that the individual left in a black car because that was information that the neighbors relayed to him. He acknowledged that he was a convicted felon, that he had spent time in the penitentiary, and that he had a Confederate flag on the wall of his apartment, but he denied that he was a racist or that he identified the assailant as black due to a prejudice against black people.

The victim's mother, Melanie Petalas, testified that the victim lived with her and used her vehicle, a 2018 Ford Escape. She said that the victim weighed approximately 560 pounds, that she had to purchase seatbelt lengtheners for him, and that it was a laborious process for him to exit the vehicle, requiring him to first place his head and shoulders outside, then his legs, and finally to pull himself upright by hanging onto the vehicle's door frame and roof. She stated that she was awakened by three gunshots at 12:30 a.m. on May 13, 2020. When she looked out her living room window, she saw her vehicle in its parking spot and began walking through the apartment looking for the victim. At that point, she heard someone call for help. She then went outside, where she found the victim lying on the ground beside her vehicle. When asked if she knew if the victim sold drugs, she replied

in the negative. She said, however, that she found some marijuana in the victim's bedroom after his death. She stated that she did not find any guns or any ammunition.

April Bracey-Wright testified that on May 13, 2020, she lived in an upstairs apartment on Cobalt Drive located diagonally from the victim's downstairs apartment. Living with her at that time were her sister and her "soon to be ex-husband" Troy Wright. The Defendant, whom she knew only as "Ghost[,]" was a friend of Mr. Wright and on more than one occasion was a long-term guest at their apartment, staying with them for "[m]onths at a time." She could not, however, recall those dates. A couple of days before the shooting, she overheard the Defendant say to Mr. Wright "[t]hat they were going to take a lick at someone." On the night of the shooting, she was asleep in her apartment when she heard two gunshots, looked out her window, and saw the victim in his vehicle with the vehicle's overhead light on. Because she had some first-aid knowledge, she went outside to render aid to the victim. The victim was still alive at that point, and she remained with him to comfort him until two police officers arrived and instructed her to back away.

On cross-examination, Ms. Bracey-Wright acknowledged that she had not mentioned anything about the "taking a lick" conversation between the Defendant and Mr. Wright until the previous week when she informed the district attorney. She further acknowledged that in her statement to police, she said that Mr. Wright had left their apartment four days before the shooting. When asked how she was able to overhear a conversation two days prior to the shooting when Mr. Wright left four days prior to the shooting, she responded that Mr. Wright was in their apartment two days prior to the shooting talking on the telephone with the Defendant. When asked how she was able to hear the Defendant's side of the conversation, she replied that the conversation was on speakerphone. She said she saw Mr. Wright on the morning before the shooting occurred and again when he returned to the apartment after the ambulance had departed. She denied that she believed Mr. Wright played a role in the crime or that she was testifying against the Defendant to protect Mr. Wright. She acknowledged that Mr. Wright had been caught in 2020 and again in 2021 in possession of a 9mm handgun. She was unaware that the police found a 9mm clip and 9mm bullets in her apartment shortly after the murder. She knew that they had found some cocaine. She did not know if the victim was a drug dealer. However, according to her testimony, Mr. Wright was a drug dealer.

On redirect examination, she testified that Mr. Wright was caught with a gun in 2020, prior to the victim's shooting, and that that gun was confiscated. In 2021, he was caught with her gun, which she did not obtain until sometime in 2021, after the victim's 2020 shooting.

CPD Officer Ronald Brown, Jr. testified that he responded to the shooting in process call at 12:38 a.m. to find CPD Officer Peoples already on the scene. He identified Officer

Peoples' bodycam and dashcam videos and described the scene to the jurors as the videos were played. He identified an aerial photograph of the apartment complex and surrounding areas, and at the request of the State, marked on it the route via Terminal Road that provided the only vehicle ingress and egress from the apartment complex, as well as the location of a restaurant known as the "Tilted Kilt" and a nearby entrance ramp to Interstate 24. On cross-examination, he agreed that Officer Peoples' dashcam video did not show that Officer Peoples passed any vehicles as he drove down Terminal Road to the apartment complex. He also acknowledged that there were several businesses along the route that could have surveillance cameras. He said he did not know if any of those cameras captured the image of a getaway vehicle.

CPD Officer Matthew Harrington testified that he arrived to find another police officer with the victim, who was "stuck in the doorjamb" of the vehicle. He said he interviewed two witnesses and learned information about a suspect vehicle, which his field training officer then relayed to the investigators.

CPD Sergeant Adam Post, who was a member of the Crime Scene Unit at the time of the shooting, identified the rough and final sketches he prepared of the crime scene. On cross-examination, he recalled that it was raining that night.

CPD Public Information Officer Scott Beaubien, who at the time of the shooting was the detective in charge of the Crime Scene Unit, identified, among other things, the crime scene photographs, including ones that showed a bullet hole in the rear passenger door of the victim's vehicle and the trajectory rod placed in the hole to show the angle of the bullet; the six 9mm shell casings that were recovered from the crime scene; touch DNA swabs from the victim's driver's door exterior handle; a RBS or red brown stain swab from the interior driver's door; and an AccuTrans fingerprint that was attempted off the exterior driver's door handle. He said that the victim's vehicle was towed to the department's evidence bay for processing due to the rain. Among the items recovered from the vehicle were a cell phone and a "rolled cigarette with . . .green plantlike material." On May 19, 2020, his team executed a search warrant on a blue Volkswagen Jetta that had been brought to Tennessee from Alabama. Among the items found during that search were a brown leather gun holster on the front passenger floorboard, a pair of socks underneath the front seat, and a pair of slides, which were described by other witnesses as flip-flops.

On cross-examination, he testified that it was not "really raining[,]" but instead "drizzly" when he arrived at the murder scene after the victim had been transported by ambulance. He identified the complete inventory of items found in the Volkswagen Jetta, which reflected that some methamphetamine was also found in the vehicle.

CPD Officer Brittany Tomberlin, a member of the Crime Scene Unit on May 13, 2020, testified that she was assigned to go to the hospital to take photographs and collect evidence from the victim. She identified photographs of the evidence she collected from the victim, which consisted of a projectile found underneath his right leg, his identification, and his wallet containing $1,597.00 in cash.

CPD Officer Allen Pendarvis, a member of the Crime Scene Unit who participated in the May 19, 2020 search of the Volkswagen Jetta, testified that he found a pair of black socks underneath the driver's seat and a pair of size 12 Nike flip-flops in the backseat.

CPD Officer Daniel Binkley, responsible for collecting the evidence found during the May 19 search of the Volkswagen Jetta, identified the various items recovered from the vehicle, which included the brown leather gun holster, the socks, the flip-flops, two DNA swabs collected from the backside of the interior passenger door handle and the backside of the interior driver's door handle, a pair of black Russell athletic pants found in the backseat on the driver's side of the vehicle, a pair of black Bobby Brooks pants found in the backseat on the passenger side of the vehicle, and a black bag containing drug paraphernalia found in the backseat of the vehicle. He said that he also submitted into evidence two fingerprint cards from the exterior driver's door, as well as some prints that were developed from one of the rear windows using "superglue fuming for prints on the inside of the vehicle."

On cross-examination, he identified a flash drive containing the numerous photographs he took of the Volkswagen Jetta and its contents, which included photographs of a glass pipe, a razorblade, and a brown, crystalline substance.

Myra Rodriguez, district manager of Clarksville Shell Stations, identified a May 13, 2020 surveillance video from the Shell Station located at 2654 Wilma Rudolph Boulevard, which was entered as Exhibit 36 for identification. CPD Detective Keenan then identified Exhibit 36 as surveillance video he collected from the 2654 Wilma Rudloph Shell Station.

CPD Detective Bruce Kilby testified that he received information on May 13, 2020, that caused him and Detective Nathan Lee to drive the next day to Hanceville, Alabama. Upon their arrival, they contacted the Hanceville Police Department, which picked up Co-Defendant Amber Tanner and had her vehicle towed to their police station. Co-Defendant Tanner consented to a search of her vehicle as she was being interviewed, and Detective Kilby began processing the vehicle by collecting six DNA swabs and starting a physical search. However, the decision was ultimately made to transport the vehicle back to Clarksville, and he discontinued his search. He recalled that during his preliminary search in Alabama, items of interest he noted were a brown leather gun holster on the front passenger floorboard, receipts in the glovebox, and a piece of paper with a brown powdery

- 7 -

substance on it.  On cross-examination, he acknowledged that he collected the DNA swabs while the vehicle was still in Alabama, and prior to the time that a search warrant was obtained for the more thorough search in Clarksville.

Twenty-six-year-old Co-Defendant Amber Tanner testified that she was currently listed on the indictment but, to her knowledge, neither she nor her attorney had been promised anything in exchange for her testimony.  She said that the Defendant was her ex-boyfriend, whom she met in high school and dated "on-and-off for a couple of years."  While they were dating, she loved the Defendant and "thought the world of him."

Co-Defendant Tanner testified that she and the Defendant broke up in 2016 but maintained contact.  She said she lived in Hanceville, Alabama in 2020.  On May 12, 2020, she and the Defendant had a conversation via text messages in which he asked to use her vehicle to go to Clarksville.  She said she told him no, and that she would have to accompany him.  She explained that the Defendant had caused her vehicle to be impounded only a couple of days earlier and implied that it happened because she allowed him to use the vehicle without her.  She stated that she and the Defendant left for Clarksville, a three-and one-half hour drive, at about 5:30 on the afternoon of May 12.  She said that the Defendant, who had a flip phone, drove, and that they followed GPS directions from her cell phone to reach the Clarksville apartment complex where the Defendant's friend, Troy Wright, lived.  She testified that the Defendant entered the destination in her cell phone.  She identified a photograph of the Defendant and herself in her vehicle, which she said was taken via Snapchat on May 12, 2020, as they traveled from Alabama to Clarksville.  The Snapchat photograph, which was admitted as Exhibit 38, has the words "Good Day" in the bottom left-hand corner, and was referred to by other trial witnesses as the "Good Day" photograph.

Co-Defendant Tanner testified that when she and the Defendant reached the Clarksville apartment complex, they went first to the home of the "White Boy," a friend of the Defendant who lived in an apartment "a couple of apartments over" from Mr. Wright's apartment, and whose name she did not know.  The Defendant got out of the vehicle and went upstairs and returned approximately ten minutes later with "White Boy,"  The Defendant and "White Boy" got into her vehicle, and she and the Defendant drove to a Shell Station, where both "White Boy" and the Defendant exited the vehicle.  Co-Defendant Tanner identified Exhibit 36 as surveillance video from that Shell Station that showed her vehicle arriving, "White Boy" exiting the rear seat and disappearing from camera view, the Defendant later exiting the driver's seat and disappearing from camera view, and both the Defendant and "White Boy" then returning to the vehicle, getting back inside, and the Defendant driving away from the Shell Station.  Exhibit 36 was admitted as an exhibit and published to the jury as she related what was happening on the video.

Co-Defendant Tanner testified that they then went to a hotel, where "White Boy" got out of the vehicle and then returned with a pill, which he gave to the Defendant. From there, they drove back to the apartment complex to drop "White Boy" off at his apartment. As soon as "White Boy" exited her vehicle, she and the Defendant drove around the corner "to the other apartments and parked." She said they remained in her parked vehicle for "hours" until the Defendant said, "The dude pulled up." At that point, the Defendant, who was dressed in all-black and wearing black socks but not his flip flops, got out of the vehicle and walked off. Not long afterward, she heard gunshots, and the Defendant came running back to the vehicle, got inside, placed his gun between her seat and the console, and drove off "through some parking lots" until he reached the main road, where he then turned left onto the interstate headed toward Nashville. She did not ask the Defendant any questions about what had just happened, and the Defendant did not volunteer anything. She stated that she and the Defendant were the only individuals in her vehicle during their drive to Clarksville, and that "White Boy" was the only other individual in their vehicle once they reached Clarksville.

Co-Defendant Tanner testified that the Defendant drove first to his friend's house in Graysville, Alabama, where they went inside and sat on the couch. While there, she heard the Defendant tell his friend that he "hit the guy with the gun in the head." She also saw the Defendant show his friend an article on her cell phone. The Defendant and his friend then walked into the kitchen, and she did not hear any more of their conversation. After a few hours, she drove the Defendant to his grandmother's house in Trussville, dropped him off, and then went to her job in Hanceville. When she got to work, she looked at her cell phone's history and saw that the article the Defendant had shown to his friend was an article from "Clarksville Now" about the victim's shooting. She mentioned the article to a coworker, and a short time later she was contacted by the police and interviewed at the jail.

Co-Defendant Tanner identified the consent to search form that she signed granting the officers consent to search her cell phone and her vehicle. She said her vehicle was a 2008 blue Volkswagen Jetta, and that she was the sole owner. She also identified the black socks that were found in the vehicle as socks that the Defendant had taken off and left in the door of her vehicle when they reached Alabama. She stated that she was interviewed two or three times. She could not recall what she said in the initial interviews but said she lied to protect the Defendant. She testified that before she and the Defendant left Alabama for Clarksville, the Defendant told her he was going to Clarksville because "he had a deal on drugs." The Defendant did not tell her with whom he had the deal or what kind of drugs were involved. She said she was not familiar with the victim.

Co-Defendant Tanner testified that she had seen the Defendant's gun earlier in the day on May 12, when she and the Defendant were still in Alabama. She said they were at

a trailer park that morning where the Defendant exited the vehicle, went into a trailer, and came back outside with a "white boy[,]" and it was at that point that she saw the gun. The gun was in a brown leather holster, and she thought she recalled that "Smith and Wesson" was written on its side. When shown a photograph of the holster recovered from her vehicle, she identified it as the same brown leather holster that had held the Defendant's gun.

On cross-examination, Co-Defendant Tanner acknowledged that she was currently out on bond, and that the amount of her bond was lowered after she had spent several months in jail. She stated that she did not know that the bond was lowered by agreement with the State as the result of her giving a statement and testifying against the Defendant. When asked whether the prosecutor announced to the judge at the bond hearing that the State had agreed to lower her bond because she was cooperating, she replied that she "did go in front of the Judge." She could not recall if she testified at that bond hearing. When asked again if her bond was lowered after she testified at that hearing, she replied that she did not know.

Co-Defendant Tanner acknowledged that the Defendant was the third person she had accused of the murder, agreeing that she told the police that she, the Defendant, Miles Hawkins, and Troy Wright were together in her vehicle shortly before the murder and that it was Mr. Hawkins and Mr. Wright who confronted the victim that night. Defense counsel played the videos of her prior statements to police as he questioned her in detail about numerous inconsistencies in her accounts, including: where she had allegedly taken a photograph of the Defendant's gun; why the photograph of the gun was not preserved on her cell phone; whether she told the police that she paid "White Boy" by CashApp for the pill he gave the Defendant, and, if so, why she did not have a record of that payment; and whether she was asleep or awake during the time she and the Defendant sat in the parked vehicle at the apartment complex and when the Defendant and his friend talked at the friend's house in Alabama. She acknowledged having testified under oath at a previous hearing that she had not seen the gun before the shooting and said that she could not tell the jury what caliber the gun was.

Tyler Morton, who lived in an apartment on Cobalt Drive at the time of the victim's murder, testified that the Defendant was "one of the rappers from the neighborhood[,]" who sometimes stayed with Troy Wright. He said he at first knew the Defendant by his last name, which he thought was a nickname, but that he later heard Mr. Wright and Riyad Baker calling him by the nickname "Ghost." He did not know how long the Defendant lived with Mr. Wright but was aware that two or three days prior to the shooting, the Defendant "and his girl got into it." He said the Defendant talked to him about it and told him that "he was going back home[,]" and that he did not see the Defendant again.

- 10 -

Mr. Morton testified that on the night of the murder, he arrived home to his apartment complex sometime between 11:00 p.m. and 12:00 a.m. He said he and friends were sitting in his vehicle smoking when he heard a gunshot. Because his sister lived in an apartment in the general direction of where the sound originated, he began running in that direction. He stated that he heard someone call for help and heard and saw the sound and the flash of additional gunshots. He thought he heard a total of five gunshots, with the final three gunshots "consecutive shots[.]" As he ran toward his sister's apartment, he saw Mr. Comly and a couple of other individuals run toward the scene and "a dark figure run away from it, at the same time."

On cross-examination, Mr. Morton acknowledged that he had a conversation with Mr. Comly after the shooting in which Mr. Comly identified the killer as a black man with dreadlocks who lived in the neighborhood. He said he had never known the Defendant to have dreadlocks. After having his memory refreshed by officer bodycam video, he acknowledged that he told the police that he had seen a dark, two-door vehicle following the victim into the apartment complex that night. He acknowledged that Mr. Wright came to his home after the shooting, but not until the police had departed the scene. He further acknowledged that he told the police that he had not seen the Defendant on the day of the murder.

On redirect examination, he identified the Defendant from Exhibit 36 as the individual visible on the Shell Station surveillance video.

Deputy Ryan Ligon of the Ford County Sheriff's Office in Dodge City, Kansas, testified that on July 24, 2020, he arrested the Defendant at a residence in Spearville, Kansas on an active warrant. He identified his bodycam video, which showed his encounter with the Defendant at the residence. He said that when he went to the residence to investigate the tip they had received, the Defendant told him that his name was Deandre Rashawn Killion and that he had an Alabama driver's license. However, Deputy Ligon's dispatch was unable to "get a return at all from that name." Deputy Ligon testified that he then compared a photograph of the Defendant on a wanted poster and found that it matched the appearance of the Defendant at the Spearville residence. In fact, the Defendant was wearing the same distinctive clothing as the clothing in which he appeared in the wanted photograph. He stated that when he confronted the Defendant with that information, the Defendant provided his real name.

Former CPD Detective Nathan Lee testified that he was the lead homicide investigator in the case. During his investigation, he received information via a telephone call that caused him and Detective Kilby to drive to Hanceville, Alabama, where they contacted the Hanceville Police Department. Officers with that department then "made contact with [Co-Defendant] Amber Tanner and her [blue] Volkswagen Jetta" at the Pitts

- 11 -

Grocery Store. Co-Defendant Tanner's vehicle was towed to the Hanceville Police Department and Co-Defendant Tanner was brought in for an interview. Detective Lee testified that during the interview, Co-Defendant Tanner consented to a search of her vehicle and her cell phone, an iPhone 8 plus. He said he interviewed her once on May 14, and again on May 15. During the May 15 interview, she named the following individuals as involved in the crime: the Defendant, Troy Wright, Miles Hawkins, and a female whose name Detective Lee could not at that time recall. Based on the information she provided, a search warrant was obtained and executed on Mr. Wright's Clarksville home and telephone. Detective Lee testified that the search of Mr. Wright's home uncovered a thirty-round 9mm magazine, several 9mm rounds, some cocaine, and a small amount of marijuana. He said they searched Mr. Wright's cell phone, and that he interviewed Mr. Wright and followed up on the statement he provided. Based on his investigation, he concluded that Mr. Wright was not present at the murder.

Detective Lee testified that approximately one week after his interview with Co-Defendant Tanner, he and Sergeant Newman interviewed Miles Hawkins and his girlfriend. He said they did not uncover any information to suggest that either Mr. Hawkins or his girlfriend were present at the time of the victim's murder.

Detective Lee testified that during his preliminary search of Co-Defendant Tanner's cell phone, he found in the map section a search for the Tilted Kilt Pub and Brewery, located at Terminal Drive and Wilma Rudolph Boulevard, less than one-half mile from the scene of the murder. He also found a "selfie" photograph taken by Co-Defendant Tanner of herself and the Defendant in her vehicle less than four hours prior to the murder. He identified the photograph, previously admitted as Exhibit 38, and said that it showed only those two individuals inside the vehicle. He said that, in addition to the photograph, he had witness statements, the surveillance footage from the Shell Station that was recorded approximately three and one-half hours prior to the murder, Co-Defendant Tanner's statement implicating the Defendant, and the map searches in Co-Defendant Tanner's cell phone. He said that an arrest warrant for the Defendant was ultimately obtained, followed by the grand jury indictment.

Detective Lee testified that "to hit a lick" was to commit a robbery or an aggravated robbery. He said that the murder weapon was never recovered. Except for the single bullet that was recovered from underneath the victim's leg at the hospital, he did not submit the projectiles and bullet fragments recovered from the victim's body to the Tennessee Bureau of Investigation ("TBI") laboratory because, without the murder weapon, "[t]here was nothing to compare them to."

On cross-examination, Detective Lee testified that it was dark and overcast when he arrived at the murder scene on March 13, 2020. He did not believe it was raining and could

not recall if the streetlights were on or off. He said he never obtained any DNA from Mr. Wright. When asked why he did not turn on the audio portion of the video recording he made during his and Sergeant Newman's transport of Co-Defendant Tanner from Hanceville, Alabama to Clarksville, he responded that the video was for his and Sergeant Tanner's protection "just in case someone were to . . . make a false claim." He stated that he did not talk to Co-Defendant Tanner about the crime during the drive.

Detective Lee acknowledged that in her first interview, Co-Defendant Tanner told him that she had not been in Clarksville, and that Miles Hawkins had her phone and her vehicle on the day of the murder. In the second interview, she told him that Mr. Hawkins, Kathleen Taylor and the Defendant travelled with her to Clarksville, that Mr. Hawkins was the one who drove her vehicle, and that they met up with Mr. Wright when they reached the apartment complex. She also described a recent injury to Mr. Wright's face. In addition, she said she saw Mr. Wright with a silver gun, that she heard Mr. Wright say to Mr. Hawkins, "He's ready for you," that Mr. Hawkins got out of the vehicle to make the drug transaction while she and the Defendant remained in her vehicle, that she heard gunshots, that Mr. Hawkins ran back to the vehicle and got into "the driver's side of the car[,]" and that Mr. Hawkins said that the drug deal had gone bad "and the guy with the rash on his face shot [the victim]."

Detective Lee could not recall how much Co-Defendant Tanner's bond was at the time of her arrest. He said he did not know how long she remained in jail before she made bond and did not know what kind of deal the State made with her in exchange for her testimony at the Defendant's trial. When asked if he was aware that her bond was lowered on May 15, 2020, to $10,000 by agreement that she cooperate with the State, remain in contact with her attorney, and return to testify, he responded that he had not seen that document. Defense counsel then introduced Co-Defendant Tanner's order for bond as a trial exhibit. The order, filed October 15, 2020, states:

> The defendant's bond is reduced to $10,000. Defendant is cooperating with the State in the prosecution of her codefendant. She will stay in contact with her attorney by checking in with her at least once every two weeks and will return to Clarksville as requested by the State. Failure to comply with his Order will be a violation of her bond conditions.

Detective Lee acknowledged that the search of Mr. Wright's home uncovered a pair of black pants, a thirty-round 9mm clip, and some 9mm bullets. He said he did not bring those bullets to court and did not have the black pants tested for the victim's blood. He stated that the bullets found in Mr. Wright's home were the same caliber as the murder weapon, but he did not know if they were the same brand. He believed that the shell casings from the crime scene were Luger and Tulammo brands. He said he could not have had the

- 13 -

bullets recovered from Mr. Wright's home "tested with Exhibit 48, which was the bullet fragments [recovered from the victim's body]" because there was "nothing to compare them to" without the murder weapon. When asked why he had the Defendant arrested for the victim's murder when Co-Defendant Tanner did not identify the Defendant to him as the murderer until July 3, he responded that Co-Defendant Tanner had earlier identified the Defendant as the murderer "to someone else that [he] interviewed."

On redirect examination, he repeated that he fully investigated Mr. Wright as a possible suspect but was unable to find any evidence that he was involved in the murder. He similarly investigated Miles Hawkins and concluded that he was not in Clarksville and was not involved in the murder. With respect to the Defendant, he testified that during his initial investigation he received a telephone call, that he spoke with more than one person, and that the information he received led him to the Defendant and Hanceville, Alabama. He further testified that Exhibit 38, the photograph of the Defendant and Co-Defendant Tanner in Co-Defendant Tanner's vehicle, was important to his investigation because it was time-stamped less than four hours before the murder and showed that only those two individuals were in the vehicle.

CPD Detective Debra Kolofsky, an expert in mobile forensics who examined Co-Defendant Tanner's cellphone, testified that she found that Exhibit 38, the "Good Day" photograph, had been saved to the phone's camera roll on May 12, 2020, at 8:51 p.m. standard time. She also found three journeys that had been entered into the Apple Maps application of the phone. The first journey, beginning at 8:04 p.m. on May 12, 2020, had the starting location of "a street near Britt Church Pike and just off of I-24" and the ending location of 2790 Wilma Rudoph, "[i]n that area of Tilted Kilt and other restaurants[.]" The second journey, which began at 1:00 a.m. on May 13, 2020, had a starting location just off I-24 east outside of Nashville and an ending location of 122 Main Street, Trussville, Alabama. The third journey, which began at 3:00 a.m. on May 13, 2020, had a starting location of I-65 South in Hartselle, Alabama and an ending location of 6 Seventh Street Northeast, Graysville, Alabama.

On cross-examination, she acknowledged that the "Good Day" photograph was taken on the Snapchat application and saved to the camera roll and that her extraction report reflected only the date and time that the photograph was saved to the camera roll. She stated that she was unable to find a photograph of a gun in a brown holster in Co-Defendant Tanner's cellphone.

CPD Sergeant Nicholas Newman of the Homicide Unit testified that he accompanied Detective Lee to Alabama "for what [he] thought was going to be a day trip to bring [Co-Defendant] Tanner back to Clarksville[.]" He said he was present for a portion of the statement that she gave that day, and that he and Detective Lee interviewed a few

potential witnesses, including Miles Hawkins and a girlfriend, and concluded that neither had been in Clarksville at the time of the murder. The following day, he and Detective Lee transported Co-Defendant Tanner back to Clarksville. Neither he nor Detective Lee discussed the case with Co-Defendant Tanner during the trip back to Clarksville.

On cross-examination, he testified that Detective Lee did not *Mirandize* Co-Defendant Tanner on the morning that they drove her to Clarksville. After being shown Co-Defendant Tanner's May 26, 2020 *Miranda* waiver form, he testified that his recollection was that the form was executed on the day before they brought her back to Clarksville. On redirect examination, he elaborated that he and Detective Lee went down to Alabama one day, *Mirandized* Co-Defendant Tanner, either received a statement or did not receive a statement and then traveled back home the following day.

Dr. Shannon Crook, the assistant medical examiner in the Davidson County Medical Examiner's Office who reviewed the autopsy report of the victim, testified that the victim had six penetrating or perforating gunshot wounds and one superficial gunshot wound. She stated that four intact projectiles and one bullet fragment were recovered from his body. In addition to the gunshot wounds, the victim had other injuries that included a small laceration on his forehead, a laceration on his nose, a cut on the left side of his upper lip, a bruise on the right side of his chest, some abrasions on his right knee, and a left maxillary canine tooth that was loosened. Based on her examination of the autopsy photographs and materials, she determined that the cause of death was multiple gunshot wounds, and that the manner of death was homicide.

TBI Special Agent Forensic Scientist Derek Proctor, an expert in firearms and toolmark analysis, testified that he examined the six cartridge casings submitted in the case and concluded that they had all been fired from the same unknown firearm. He said that all six were 9mm Luger cartridges, a very common pistol round. He stated that after he identified them as originating from the same unknown firearm, he entered them into the "N.I.B.I.N. Database" to see if they had any link or association to other cartridge cases that had been entered. However, there were no associations found. He also examined the single bullet submitted, taking measurements of the "lands and groves" that were on the bullet. He stated that the diameter of the base of the bullet was roughly nine millimeters, or .357 inches, which meant that it could have been fired through a .357 Magnum, a .38 Special, a 9mm Luger, or a .38 Auto, which were all weapons with a similar diameter.

On cross-examination, he testified that he would be unable to match shell casings with unfired bullets. He could, however, identify whether they were manufactured by the same company, whether they were of the same grain weight, and whether they were of a similar jacket material.

- 15 -

TBI Agent Kathy Kathi Gibson, an expert in latent print analysis, identified her report, which reflected that she was unable to find any fingerprints on the AccuTrans fingerprint card from the victim's driver's door handle and unable to obtain any identifiable fingerprints from the fingerprint cards from Co-Defendant Tanner's Volkswagen Jetta.

TBI Special Agent Forensic Scientist Charly Castelbuono of the Forensic Biology Unit testified that she obtained DNA standards from the Defendant and the victim and performed DNA testing on items submitted for analysis. From the inside of the black socks found in the Volkswagen Jetta, she obtained a DNA profile that was a mixture of at least three individuals, with the major contributor the Defendant. From the Volkswagen Jetta driver's door pull, she obtained a DNA profile that was consistent with the DNA profile of at least three individuals, with the major contributor profile containing the DNA of two individuals: the victim and an unknown female. From the vehicle's steering wheel and gear shift, she was able to obtain DNA profiles in which the major contributor was an unknown female. She testified that the victim's DNA could have been deposited on the Volkswagen Jetta's door pull either by direct or indirect transfer and agreed that one possible method for indirect transfer would be if someone punched the victim and then touched the door pull.

On cross-examination, she acknowledged that she asked for a DNA standard from Co-Defendant Tanner but one was never provided. She then agreed that, had Co-Defendant Tanner's DNA been submitted, she could have compared it to the DNA profile of the unknown female. She stated that she was not provided with DNA standards from Miles Hawkins or Troy Wright. Finally, she acknowledged that the Defendant's DNA was not found on the Volkswagen Jetta's driver's door pull. On redirect examination, she testified that she would expect to find a vehicle owner's DNA inside the owner's vehicle and that it would also be possible to find it on the outside door handle.

CPD Detective Bruce Kilby was recalled as a witness by the State to clarify a discrepancy with respect to the timing of his collection of DNA swabs from the Volkswagen Jetta, a topic on which defense counsel had cross-examined Detective Lee. On cross-examination, he acknowledged that he never tested the DNA of Riyad Baker, Miles Hawkins, and Troy Wright with the DNA profile that contained a mixture of the victim's DNA. After being shown a portion of the responding officer's bodycam video, he further acknowledged that Mr. Comly and Ms. Davenport described the only individual they saw at the victim's vehicle as a six-foot black male with short dreadlocks.

The Defendant elected not to testify and rested his case without presenting any witnesses. Following deliberations, the jury convicted him of the lesser offense of second degree murder in count one and acquitted him of count two of the indictment. The Defendant opted to represent himself at the September 13, 2023 hearing on his motion for

new trial, and at the conclusion of the hearing, the trial court orally denied the motion and appointed counsel to represent the Defendant on appeal. On November 23, 2023, the trial court entered a written order denying the motion for new trial. On September 15, 2023, the Defendant filed a timely but premature notice of appeal.

## ANALYSIS

### I. State's Failure to Correct Alleged Perjured Testimony

The Defendant first argues that his due process rights to a fair trial were violated by the State's failure to correct false testimony given by a material witness; namely, Co-Defendant Tanner's testimony that she was unaware of the agreement for her bond to be lowered for testifying against the Defendant. He acknowledges that he failed to raise the issue in his motion for new trial but contends that he is entitled to plain error relief. The State disagrees, arguing that the Defendant waived the issue for failure to raise it in his motion for new trial, and that he cannot establish all the plain error requirements.

Because the Defendant failed to raise the issue in his motion for new trial, he is limited to plain error review. We may consider an issue to be plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); *see also State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the *Adkisson* test for determining plain error). Furthermore, the "'plain error' must be of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)).

We agree with the State that the Defendant cannot show the required factors for plain error relief. First, although the State has "an affirmative duty to correct false testimony presented by State's witnesses," *State v. Watkins*, No. M2017-01600-CCA-R3-CD, 2019 WL 1370970, at *11 (Tenn. Crim. App. Mar. 26, 2019), *no perm. app. filed*; *see State v. Spurlock,* 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993)("It is a well established principle of law that the state's knowing use of false testimony to convict an accused is violative of the right to a fair and impartial trial as embodied in the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, §§ 8 and 9 of

the Tennessee Constitution.")(citations omitted), it is not at all clear that Co-Defendant Tanner's testimony on the topic was false. Co-Defendant Tanner's testimony on the topic was as follows:

Q. Ms. Tanner, as you sit here today, area you out on bond?

A. Yes, sir.

Q. Did you have to make a bond in this case?

A. Yes, sir.

Q. Was this bond lowered by agreement with the State, after you test[ifi]ed about - - against [the Defendant]?

A. I don't know what you're saying.

Q. Okay. So you were in jail when they brought you back from Alabama, right?

A. Yes.

Q. And you were held here in Montgomery County, for several months before your bond was lowered, correct?

A. Yes.

Q. And it wasn't until you gave a statement against [the Defendant] and testified against him before your bond was lowered by agreement, correct?

A. No.

Q. So your bond was never lowered?

A. It was lowered.

Q. Did you have a hearing over it and the Judge lowered it or did you go in front of a judge and the State said, "We agree to lower her bond, because she's cooperating."?

- 18 -

A. I did go in front of the Judge.

Q. Did you testify at the bond hearing?

A. I don't remember.

Q. The bottom line is; your bond was lowered so you could get out of jail, after you testified against [the Defendant] in this case, correct?

A. I don't know.

Based on the above testimony, the Defendant has failed to demonstrate that false or perjured testimony was admitted at trial. Co-Defendant Tanner testified that she did not know if her bond was lowered conditioned on her cooperation with the State, and the Defendant has not shown that such testimony was false. Thus, the Defendant cannot show that a clear and unequivocal rule of law was breached by the State's failure to correct Co-Defendant Tanner's disavowal of knowledge of any agreement that her bond be lowered in exchange for her testimony.

The Defendant also cannot show that a substantial right of his was adversely affected, that he did not waive the issue for tactical reasons, or that consideration of the error is necessary to do substantial justice. The jury was made aware at several different points during the trial of Co-Defendant Tanner's cooperation with the State and the lowering of her bond, which enabled her to get out of jail. Moreover, as the State points out, defense counsel vigorously cross-examined Co-Defendant Tanner about her cooperation with the State and argued in closing that the lowering of her bond gave her a motive to lie to implicate the Defendant. We, therefore, conclude that the Defendant is not entitled to plain error relief.

## II. Sufficiency of the Evidence

The Defendant next challenges the sufficiency of the evidence, arguing that the evidence was "circumstantial at best" and insufficient for the jury to find him guilty of the second degree murder of the victim. In support, he cites, among other things: the fact that he and Co-Defendant Tanner had an on-again, off-again relationship, which provided an innocent explanation for his socks to be in her vehicle; the State's failure to compare evidentiary DNA swabs to the DNA profiles of Mr. Wright and Mr. Hawkins, despite Co-Defendant Tanner's statement that they were both in her vehicle and committed the crime; Detective Kolofsky's inability to pinpoint when the "selfie" photograph of the Defendant and Co-Defendant Tanner was taken; and the fact that much of the State's case relied on

what the Defendant characterizes as the "questionable testimony" of Co-Defendant Tanner. The State argues that there was ample evidence to support the jury's determination that the Defendant knowingly killed the victim. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

Second degree murder is the knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1). Our supreme court has determined that second degree murder is a result-of-conduct offense. *See State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b).

When viewed in the light most favorable to the State, the evidence established that the Defendant, who lived for some time in the same apartment complex as the victim, spoke to Mr. Wright about taking a lick at someone two days before he drove with Co-Defendant Tanner from Alabama to the victim's Clarksville apartment. There, the armed Defendant waited for the victim to arrive home, approached the victim's vehicle, punched the victim repeatedly in the face as he demanded the victim's "s**t", and then fired multiple gunshots

at the unarmed victim, killing him.  Afterward, the Defendant fled first to Alabama, where he told a friend that he had "hit the guy with the gun in the head" and showed the friend an article about the victim's shooting.  From there, the Defendant fled to Kansas, where he was eventually apprehended.  From all this evidence, a rational jury could find the Defendant guilty of the second degree murder of the victim beyond a reasonable doubt. We, therefore, affirm the Defendant's conviction.

## CONCLUSION

Based on our review, we affirm the judgment of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE

- 21 -